# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DISVISION

THOMAS PHELPS,               )        CASE NO.  5:16-cv-1936
                              )
            PLAINTIFF,     )        JUDGE SARA LIOI
                              )
vs.                         )        MEMORANDUM OPINION
                              )
TUSCARAWAS COUNTY,      )
OHIO/TUSCARAWAS COUNTY   )
BOARD OF COMMISSIONERS, et al., )
                              )
           DEFENDANTS.   )

Before the Court are two motions for summary judgment. The first is the motion of defendant Jeremy Everett ("Everett"). (Doc. No 46. ["Everett Mot."].) Plaintiff Thomas Phelps ("Phelps") opposed the motion (Doc. No. 54 ["Opp'n Everett Mot."]), and Everett filed a reply (Doc. No. 55 ["Reply Everett Mot."]). The second is the motion of defendants Tuscarawas County (Tuscarawas County Commissioners) ("Tuscarawas County"), Sheriff Walter Wilson ("Wilson"), and Officer Vonda Hamilton ("Hamilton") (collectively "Tuscarawas County defendants"). (Doc. No. 47 ["Tusc. Cty. Mot."].) Phelps opposed the motion (Doc. No. 53 ["Opp'n Tusc. Cty. Mot."]), and the Tuscarawas County defendants filed a reply (Doc. No. 56 ["Reply Tusc. Cty. Mot."]).

For the reasons that follow, defendants' motions are granted.

# I.  BACKGROUND

Many of the background facts of this case are not in dispute. Wilson was the Tuscarawas County Sheriff at the time of the events at issue,[1] and Everett was the administrator of the Tuscarawas County Jail.[2] (Doc. No. 46-1 (Affidavit of Jeremy Everett ["Everett Aff."]) ¶ 1.) As administrator, Everett directed the day-to-day operations of the jail, including responding to emergency situations. (*Id.*) Hamilton was an employee of the Tuscarawas County Sheriff's Department at all relevant times. (Doc. No. 47-4 (Deposition of Vonda Hamilton ["Hamilton Dep."]) at 316 (5).) The specific events at issue in this case occurred on August 19, 2014, but defendants' interactions with Phelps prior to that date are relevant.

### *June 2014 – August 18, 2014*

In the summer of 2014, Phelps was incarcerated at the jail as a pretrial detainee because of domestic violence allegations. (*See* Doc. No. 61 (Deposition of Thomas Phelps ["Phelps Dep."]) at 896; Doc. No. 54-1 at 485; Doc. No. 60 (Deposition of Nicole Peters[3] ["Peters Dep."]) at 751.) The parties do not dispute that, at the jail on June 20, 2014, Phelps deliberately banged his head so hard that he cut it and was transported to Union Hospital to repair the cut. Nor do they dispute that, while being transported back to the jail from the hospital, Phelps banged his head against the window of the cruiser so hard that he reopened the repaired cut and broke the window. Phelps was returned to the hospital and thereafter admitted to Heartland Behavioral

---

[1] Wilson retired as sheriff on January 1, 2017. (Doc. No. 47-3 (Deposition of Sheriff Walter Wilson ["Wilson Dep."]) at 295 (5) (All page number references are to page number identification numbers generated by the Court's electronic filing system. Where deposition transcripts are filed with multiple transcript pages on a single electronic filing page, the transcript page number appears in parentheses following the page identification number).)

[2] When Wilson retired, the new sheriff discharged Everett as administrator and appointed a different jail administrator. (Everett Aff. ¶ 2.)

[3] Peters was a licensed practical nurse at the jail in the summer of 2014.

Health Care Center ("Heartland"). (Opp'n Everett Mot. at 464; Everett Mot. at 234; Doc. No. 54-1 at 484; Doc. No. 54-5 at 581.) A nursing note from that day states that Phelps "[w]ill probably be placed on suicide watch here unless we can get Rx's that are current for inmate.'" (Opp'n Everett Mot. at 464-65, citing exhibits 1 and 5[4]; Doc. No. 54-1 at 490.)

On July 14, 2014, Phelps harmed himself again at the jail by banging his head, and was transported to the hospital and then to Heartland. (*See* Phelps Dep. at 940; Opp'n Everett Mot. at 465.) On July 17, 2014, Phelps was discharged from Heartland and transported back to the jail. (Everett Aff. ¶ 3; Opp'n Everett Mot. at 465.) When Phelps was discharged, he reported as not being suicidal and ready to return to jail. Heartland found him to be stabilized and ready for discharge with "regular checks" and prescribed medication. (Doc. No. 55-1 at 592.)

Everett understood from Heartland that Phelps was self-injurious because of problems with his girlfriend and because he was incarcerated, not because he wanted to kill himself. (Everett Aff. ¶¶ 3, 6, 7; Doc. No. 55-1 at 592-93.) While Heartland did not find Phelps to be suicidal, he was diagnosed with a number of mental disorders.[5] (*See* Doc. No. 54-2 at 534;

---

[4] The Court notes that Phelps' oppositions to the motions generally cite to voluminous exhibits in their entirety. The Court requires the use of pinpoint citations when citing the record. (Doc. No. 3 at 19 ("All facts presented to the Court in any brief or memorandum setting forth a party's position with respect to a motion must be supported by pinpoint citations to the case record. For example, it is *not* sufficient to say: '*See* Green Affidavit' or '*See* Williams Deposition.'").) The Court is not required to search the record to determine if it is "bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir. 1989) (footnote omitted)); Fed. R. Civ. P. 56(c)(3). It is Phelps' obligation to point to specific facts supported by the record that demonstrate a genuine issue of fact for trial. *See Card-Monroe Corp. v. Tuftco Corp.*, 270 F. Supp. 3d 967, 986 (E.D. Tenn. 2017).

[5] In addition to those disorders, Phelps contends that he was diagnosed with other mental health issues in the past, including bipolar and bipolar schizoaffective with suicidal tendencies. (Opp'n Everett Mot. at 464, citing Phelps' deposition and exhibits.) While Heartland found that Phelps was not suicidal at the time of its assessment in July 2014, there is evidence in the record that Phelps had suicidal tendencies or attempted suicide in the past. (*See, e.g.,* Doc. No. 54-2 at 538 ("He has a history of cutting himself and requiring sutures. He made a suicide attempt via cutting his throat in the past, also."); Phelps Dep. at 878, 885.) Phelps had a history of banging his head and cutting himself for the past 10 or 20 years. (*See id.* at 878, 884-85, 941-42.) There is also some evidence in the record that Phelps smashed a TV while at the jail in 2005, and cut himself. (*See* Doc. No. 59 (Deposition of James Milburn ["Milburn Dep."]) at 675 (15); Phelps Dep. at 941-42.)

Phelps Dep. at 946-47.)) Phelps has not provided any expert evidence disputing Heartland's assessment that Phelps was not suicidal when he was discharged from Heartland on July 17, 2014.

Everett considered Heartland's assessment of Phelps' mental health and decided not to house Phelps in the general population or place him on suicide watch. Rather, Everett determined to house Phelps in the classification unit where he could be observed more closely than the general population and maximum security area because there is direct visual observation by the booking desk and by officers on regular rounds. (Everett Aff. ¶¶ 4-7; Hamilton Dep. at 318 (15)); Milburn Dep. at 682 (45) (The classification unit is "pretty much a place where you go and they can view you, make sure that you ain't going to hurt yourself.").)

After Phelps returned to the jail on July 17, 2014, the staff administered his daily medications, which were adjusted as necessary in consultation with the doctor. For example, Phelps visited the jail clinic on July 24, 2014 stating that he felt depressed, and his medication was adjusted. (*See* Doc. No. 46-2 (Affidavit of Nicole Peters ["Peters Aff."]) ¶¶ 5-7; *see also* Everett Mot. at 235, 237 (dosage of Wellbutrin increased); Peters Dep. at 779.) During the time period from July 17, 2014 through August 18, 2014, Phelps received both medical and mental health care, was apparently doing well overall, and did not convey to the jail staff any thoughts of injuring himself or of suicidal ideation. (Peters Aff. ¶¶ 3-8; Everett Aff. ¶¶ 8-12.) Phelps does not contend that, during this time period, he conveyed to defendants or jail staff any thoughts of harming or killing himself. Indeed, Phelps described his mood as fair and that he was coping in the days leading up to August 19, 2014. (Phelps Dep. at 899-900.)

*August 19, 2014*

Everett visited with Phelps on August 18, 2014 concerning Phelps' complaints of pain possibly related to a hernia operation. Everett found Phelps to be lucid, and Phelps provided Everett with his medical history and signed an authorization so that Everett could obtain his medical records. Phelps made no mention to Everett of depression or thoughts of harming himself. (Everett Aff. ¶¶ 8-12.) Phelps does not dispute Everett's impression of Phelps' mental state on August 18, 2014, or dispute that he did not communicate any thoughts of self-harm to Everett during that visit.

On August 19, 2014, Phelps was housed in the jail's classification unit where he had been since July 17, 2014. Hamilton was on duty at the booking desk. An intercom system connects the classification unit with booking. (Hamilton Dep. at 318 (16).)

Phelps maintains that, on August 19, 2014, he pressed the intercom button and made multiple requests to Hamilton over the intercom to "see mental health." (Phelps Dep. at 901-02, 909, 913-14.) According to Phelps, Hamilton told him to sit down and deal with it. (*Id*. at 910.) Phelps also contends that he spoke with the individual who distributed morning medications about seeing mental health, and was told to send a kite, which Phelps admittedly did not do. (*Id*. at 911-12.) Two individuals in the classification unit with Phelps that morning, Milburn[6] and Richard Jamerson, also maintain that Phelps requested to see mental health using the intercom, but Phelps did not say he wanted to kill himself (Milburn Dep. at 675 (15-17); Doc No. 58

---

[6] Everett disputes whether Milburn was in the classification unit on August 19, 2014. (Everett Mot. at 241; *see* Everett Aff. ¶ 21.)

(Deposition of Richard Jamerson ["Jamerson Dep."]) at 629-31) or hurt himself. (Jamerson Dep. at 631 (28)). According to Milburn, when Everett walked by the classification unit, Phelps told Everett that he needed to talk with someone before he did "something stupid" but Everett told him it was "not my problem" and went to the booking area. (Milburn Dep. at 674 (11).)

Hamilton states that she was not aware that anyone in the classification unit rang the intercom on August 19, and did not know that there was an issue with Phelps until another inmate in that unit began pounding on the windows.[7] At that time, Hamilton was at the booking counter talking to a probation officer from municipal court. When Hamilton heard the pounding, she walked over to the booking door and could see that Phelps had taken the TV off the wall, broken it, and had cut his arm with a piece of glass. Prior to hearing the pounding, Hamilton was not aware, and did not hear Phelps say, that he needed to talk with someone or that he was losing control. (Hamilton Dep. at 318-19 (16-21).) Jamerson estimates that about 10-15 minutes elapsed from the time Phelps first pressed the intercom button and when he removed the TV from the wall. (Jamerson Dep. at 630 (24-25).) Phelps is uncertain about the time frame of the events of August 19. (*See* Phelps Dep. at 912-13.)

As it must on summary judgment, the Court will view the evidence on this disputed issue in favor of Phelps. But, even assuming that Phelps requested to see mental health that morning and Hamilton heard his request, Phelps concedes that he "didn't say [he] was going to kill [him]self." (*Id.* at 949-50 (The [o]nly time I said that is when Everett escalated the situation where I told him I was going to cut my head off and he stated back . . . do what you gotta do. Do

---

[7] Phelps was standing by the TV and Jamerson realized "the shit was about to hit the fan" and began beating on the window for help. (Jamerson Dep. at 629-30 (21-23).)

what you gotta do, you're nothing but paperwork."); *see also* Milburn Dep. at 675 (17) ("He didn't say that he was going to kill himself. He just said he wanted to talk to somebody[.]").)

There is no dispute that an emergency presented itself when Phelps removed the TV from the wall and began cutting himself. When Hamilton saw that Phelps had cut his arm, she called for help. (Hamilton Dep. at 319 (20).) Jail personnel began arriving on the scene, and Peters was one of the first to arrive. When she arrived, Phelps was holding a piece of glass in his hand and had already cut his arm. (Peters Aff. ¶¶ 1, 9.) Peters tried to calm Phelps by talking with him through the open food pass chute in the cell door and asked him to put the glass down. (Peters Dep. at 724-28.) Peters believed Phelps to be suicidal at that time based on his conduct. (*Id.* at 757-58.) When Everett arrived, he kicked the food chute closed to protect Peters from Phelps cutting Peters with glass by reaching through the open chute. (Everett Aff. at ¶¶ 17-18.) While Everett's action agitated Phelps, Phelps has advanced no evidence raising a genuine dispute of fact that Everett closed the food chute to protect Peters.

The parties dispute whether words were exchanged between Phelps and Everett at this time. According to Phelps, when Everett "escalated" the situation by kicking the chute closed Phelps told Everett "I'm going to cut my head off and [Everett] says, do what you gotta do." (Phelps Dep. at 919.) Jamerson testified that at some point Everett asked Phelps what he was trying to do and Phelps replied that he was trying to kill himself, to which Everett responded "then do what you got to do[,]" and Milburn provided similar testimony.[8] (Jamerson Dep. at 630 (23, 24); *see* Milburn Dep. at 674-75 (11-13).) Everett denies that he made any such statements.

---

[8] But Milburn also testified that Everett instructed Phelps to stop cutting himself. (Milburn Dep. at 683 (48) (Everett was yelling at Phelps to stop or they were going to make him stop.).)

(Everett Aff. ¶ 24.) To the extent that this dispute is material, the Court concludes that a reasonable juror could find that Everett made the statements at issue.

Phelps does not dispute that, after Everett kicked the food chute closed, which agitated Phelps, Peters kept talking to Phelps and succeeded in quickly calming him down again. (Peters Aff. ¶¶ 10-11.) The other inmates in the classification unit were ordered to lock down, and Everett ordered jail personnel to don their personal protective equipment. There is no dispute that Phelps was ordered to lay down on the floor and that he voluntarily complied. Phelps was handcuffed and removed from the classification unit. (Everett Aff. ¶¶ 19, 21-22; Phelps Dep. at 932-33; Peters Aff. ¶ 12.)

Phelps claims that he was maced and "dragged" to a holding cell, did not receive treatment, and was held down on the bed until a decision was made as to whether he would be transported to the hospital by jail personnel or by ambulance. (Phelps Dep. at 920-21; 932-34.) But the jail video provided by Everett as Attachment 3 to his reply in support of the motion (and Everett's explanatory supplemental affidavit) plainly shows Phelps calmly walking (not being dragged) from the classification unit and then seated on a bed and provided with medical attention. (Doc. No. 57; Doc. No. 55-2 (Supplemental Affidavit of Everett ["Supp. Everett Aff."]) ¶¶ 9-16.) Thus, the Court does not credit Phelps' testimony in this regard.[9]

Phelps' wounds were not life-threatening, and they were cleaned and bandaged at the jail before Phelps was transported to the hospital. (*See* Peters Aff. ¶ 14.) Phelps has provided no evidence that the cuts he inflicted upon himself were life threatening, and his injuries do not

---

[9] *Coble v. City of White House, Tenn.*, 634 F.3d 865, 869 (6th Cir. 2011) (When a non-moving party's version of events are blatantly contradicted by objective evidence in the record, it fails to create a genuine issue of fact for trial.) (citations omitted).

appear so on the video of those events. (*See* Doc. No. 57.) After Phelps was secured and receiving medical attention, but before he was transported to the hospital, he told Peters that he wanted to die. (Peters Dep. at 757.) After medical treatment, Phelps was again taken to Heartland. Heartland records from August 20, 2014 describe Phelps' chief complaint as "I broke the TV, took the glass and cut my neck and hand. I want to kill myself." (Doc. No. 54-2 at 541.)

### Phelps' complaint and defendants' motions

For his complaint, Phelps alleges that he was known by defendants to be self-injurious from the time he entered the jail in June 2014 through the events of August 19, 2014, and that defendants were deliberately indifferent and failed to provide him with adequate medical care, causing him injury. Phelps also alleges that defendants failed to have adequate policies, procedures, and training in place to protect Phelps from a substantial risk of harm. Phelps claims that, pursuant to 42 U.S.C. § 1983, defendants' deliberate indifference and failures violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution to adequate medical care and to be free from cruel and unusual punishment. Everett and Hamilton are sued in their individual and official capacities, and Wilson is sued in his official capacity as Tuscarawas County Sheriff.

On summary judgment, Everett argues that he is entitled to qualified immunity with respect to Phelps' § 1983 claim that Everett violated his constitutional rights under the Eighth and Fourteenth Amendments. Tuscarawas County, Wilson, and Hamilton also move for summary judgment on Phelps' § 1983 claim, incorporate the evidence and arguments set forth in Everett's motion, and argue that Phelps' complaint should be dismissed for the additional reason that Phelps fails to state a claim. (Tusc. Cty. Mot. at 267-71.) Because the Court concludes that

the defendants are entitled to summary judgment, the Court will not address defendants' arguments that the complaint fails to state a claim.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if its resolution affects the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate. *Id.*

The moving party must provide evidence to the court that demonstrates the absence of a genuine dispute as to any material fact. Once the moving party meets this initial burden, the opposing party must come forward with specific evidence showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Anderson*, 477 U.S. at 250. It is the nonmoving party's duty to point out specific facts in the record that create a genuine issue of material fact; the trial court does not have a duty to search the record "to establish that it is bereft of a genuine issue of material fact." *Street*, 886 F.2d at 1479-80 (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)); *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992) (citation omitted).

The nonmoving party may oppose a summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves[.]" *Celotex*, 477

U.S. at 324. The Court must view all facts and evidence, and inferences that may be reasonably drawn therefrom, in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962). General averments or conclusory allegations of an affidavit do not create specific fact disputes for summary judgment purposes. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).

"Summary judgment requires that a plaintiff present more than a scintilla of evidence to demonstrate each element of a prima facie case." *Garza v. Norfolk S. Ry. Co.*, 536 F. App'x. 517, 519 (6th Cir. 2013) (citing *Van Gorder v. Grand Trunk W. R.R.*, 509 F.3d 265, 268 (6th Cir. 2007)). "'The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party].'" *Street*, 886 F.2d at 1477 (*quoting Anderson*, 477 U.S. at 252).

The district court's review on summary judgment is a threshold inquiry to determine whether there is the need for a trial due to genuine factual issues that must be resolved by a finder of fact because those issues may reasonably be resolved in favor of either party. *Anderson*, 477 U.S. at 250. That is, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 578 (6th Cir. 2003).

> [Summary judgment is required] against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is entitled to judgment as a matter of law because the nonmoving party has failed to make a sufficient

showing of an essential element of her case with respect to which she has the
burden of proof.

*Celotex,* 477 U.S. at 322-23 (internal quotation marks and citation omitted).

### B. 42 U.S.C § 1983

Phelps' claims against Everett, Hamilton, Wilson, and Tuscarawas County are brought
pursuant to 42 U.S.C. § 1983. "To establish a claim under 42 U.S.C. § 1983, a plaintiff must
'identify a right secured by the United States Constitution and the deprivation of that right by a
person acting under color of state law." *Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th
Cir. 2001) (quoting *Russo v. City of Cincinnati,* 953 F.2d 1036, 1042 (6th Cir. 1992)); *Colen v.
Corizon Med. Servs.*, No. 14-CV-12948, 2018 WL 1477664, at *10 (E.D. Mich. Mar. 27, 2018)
(same) (citing *West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988)).

Defendants in this case are state actors for the purpose of § 1983. For his § 1983 claim,
Phelps alleges that defendants violated his constitutional rights as a pretrial detainee to adequate
medical care. The Eighth Amendment, which provides an inmate the right to be free from cruel
and unusual punishment, does not apply to pretrial detainees. But, under the Fourteenth
Amendment's due process clause, pretrial detainees have a right to adequate medical care that is
analogous to the Eighth Amendment rights of prisoners. *Watkins*, 273 F.3d at 685-86 (citing *City
of Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244, 103 S. Ct. 2979, 77 L. Ed. 2d 605 (1983));
*Powers v. Cty. of Lorain*, 259 F. App'x 818, 821 (6th Cir. 2008) ("Pre-trial detainees have rights
to adequate medical treatment analogous to those of prisoners; however, these rights stem from
the Due Process clause of the Fourteenth Amendment instead of the Eighth Amendment.")
(citing *City of Revere,* 463 U.S. at  244).

### C. Qualified Immunity

Everett and Hamilton, who are sued in their individual capacities, argue on summary judgment that Phelps' claims against them should be dismissed because they are entitled to qualified immunity. The initial burden is on the defendants to plead the defense of qualified immunity, which they have done in this case. (Doc. No. 9 ¶ 15.) Phelps then bears the burden of showing that Everett and Hamilton are not entitled to qualified immunity. *Sheets v. Mullins,* 287 F.3d 581, 586 (6th Cir. 2005). To survive summary judgment, Phelps must advance evidence of a genuine issue of material fact on the issue of whether Everett and Hamilton are entitled to qualified immunity. *Garretson v. City of Madison Heights*, 407 F.3d 789, 798 (6th Cir. 2005) (citing *Sheets*, 287 F.3d at 586 (citing *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992))).

"In order to prevail in a § 1983 action for civil damages from a government official performing discretionary functions, the defense of qualified immunity that [established case law has] recognized requires that the official be shown to have violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"[10] *Conn v. Gabbert,* 526 U.S. 286, 290, 119 S. Ct. 1292, 143 L. Ed. 2d 399 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)); *Solomon v. Auburn Hills Police Dep't,* 389 F.3d 167, 172 (6th Cir. 2004) (quoting *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). The issue is not the subjective good or bad faith of the public official, but the "objective legal reasonableness" of the official's action in light of clearly established law at the time. *Creighton,* 483 U.S. at 639 (citation omitted). "If officers of

reasonable competence could disagree on the issue, then qualified immunity should be recognized." *Stevens-Rucker v. City of Columbus*, 242 F. Supp. 3d 608, 620 (S.D. Ohio 2017) (citing *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986))).

"In order to determine if an officer's actions are entitled to qualified immunity, the Court employs a two part test: '(1) whether the facts, when taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (2) whether the right violated was clearly established such that a reasonable official would understand that what he is doing violates that right.'" *Stevens-Rucker*, 242 F. Supp. 3d at 620 (quoting *Mullins*, 805 F.3d at 765); *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 602 (6th Cir. 2005) (citing *Saucier v. Katz,* 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)). The two prongs of this test may be analyzed in either order. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)).

### D. Everett and Hamilton are Entitled to Qualified Immunity on Phelps' § 1983 claim

Pretrial detainees have a constitutional right to medical care even when their injuries are self-inflicted. *Powers*, 259 F. App'x at 821 (citation omitted). A cause of action under § 1983 for failure to provide adequate medical care requires a showing that "the defendants acted with 'deliberate indifference to the serious medical needs' of the pre-trial detainee." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005) (internal quotation marks omitted) (citing

---

[10] The parties do not dispute that Everett and Hamilton were exercising discretionary functions at all relevant times for the purpose of qualified immunity analysis.

*Watkins,* 273 F.3d at 686 (quoting *Estelle v. Gamble,* 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976))).

"There are two parts to the claim, one objective, one subjective. For the objective component, the detainee must demonstrate the existence of a sufficiently serious medical need." *Estate of Carter*, 408 F.3d at 311 (internal quotation marks omitted) (quoting *Blackmore v. Kalamazoo Cty.,* 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994))). "For the subjective component, the detainee must demonstrate that the defendant possessed a sufficiently culpable state of mind in denying medical care."[11] *Id.* (internal quotation marks and citation omitted).

### 1. Objective component

The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore*, 390 F.3d at 899. In addition to obviousness, "'a medical need is objectively serious if it is one that has been diagnosed by a physician as mandating treatment[.]'" *Richmond*, 885 F.3d at 938 (internal quotation marks omitted) (quoting *Blackmore*, 390 F.3d at 897 (further citation omitted)).

Phelps has an extensive history of brushes with the law, incarceration at the jail, various psychiatric episodes, and self-harm of which defendants were aware. It is undisputed that, during the time period from June 2014 until July 14, 2014, Phelps engaged in self-harm that was so serious that both medical care (at a hospital) and mental health treatment (at Heartland) were

---

[11] The Sixth Circuit has not yet determined whether *Kingsley v. Hendrickson*, —— U.S. ——, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015), abrogates the subjective intent requirement of a Fourteenth Amendment deliberate indifference claim. *See Richmond v. Huq*, 885 F.3d 928, 938 n.3 (6th Cir. 2018).

required, and jail personnel provided follow-up care and medication required by those treatments. *Berkshire v. Dahl*, No. 12-12038, 2014 WL 5847614, at *6 (E.D. Mich. Nov. 12, 2014) (significant history of psychiatric intervention and self-harm satisfies the objective prong of plaintiff's deliberate indifference claim).

While Phelps had a history of self-harm and psychiatric intervention, there is no dispute that, during the month preceding August 19, Phelps was receiving his medication and was seen at the jail clinic for both medical and mental health care, and exhibited no episodes of self-harm or suicidal ideation. On August 19, while Phelps claims that he told Everett and Hamilton that he wanted to talk with mental health, he admits that he did not tell them that he wanted to kill himself, and did not plan to (or say) that he was going to hurt himself. (Phelps Dep. at 924 ("It was just I reacted and no thought of doing it or thinking, okay, I should do this. It's just a reaction that I just reacted with no thought.").

But when Phelps removed the TV from the wall in the classification unit and began cutting himself, his need for medical care was apparent. Peters considered this conduct suicidal and Phelps said he was going to cut his head off. "The Sixth Circuit has long recognized that psychological needs manifesting themselves in suicidal tendencies are serious medical needs[.]" *Linden v. Washtenaw Cty.*, 167 F. App'x 410, 416 (6th Cir. 2006) (internal quotation marks and citations omitted).

Drawing all inferences in Phelps' favor, the Court concludes that a reasonable juror could find that Phelps has satisfied the objective prong of his § 1983 deliberate indifference claim.

## 2. Subjective component

In order to establish the subjective component, Phelps must show that Everett and Hamilton "subjectively perceived facts from which to infer substantial risk to the [pretrial detainee], that [they] did in fact draw the inference, and that [they] then disregarded that risk.'" *Shough v. Mgmt. &Training Corp.*, No. 3:16 CV 53, 2018 WL 295576, at *8 (N.D. Ohio Jan. 3, 2018) (quoting *Comstock v. McCrary,* 273 F.3d 693, 703 (6th Cir. 2001)).

### *Deliberate indifference standard*

"This standard requires that the defendant's *mens rea* be higher than negligence but lower than purposeful or knowing infliction of harm." *Linden*, 167 F. App'x at 416 (citations omitted); *Shough*, 2018 WL 295576, at *8 (citing *Farmer,* 511 U.S. at 860). "Rather, 'obduracy and wantonness' are required to make a showing of deliberate indifference." *Richmond*, 885 F.3d at 939 (quoting *Boretti v. Wiscomb*, 930 F.2d 1150, 1153 (6th Cir. 1991)).

But "'an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under [established case law] be condemned as the infliction of punishment.'" *Richmond*, 885 F.3d at 939 (quoting *Farmer*, 511 U.S. at 838). "If an officer fails to act in the face of an obvious risk of which he should have known but did not, the officer has not violated the Eighth or Fourteenth Amendments." *Watkins,* 273 F.3d at 686 (citing *Farmer*, 511 U.S. at 837-38). In order to prevail on his § 1983 deliberate indifference claim, Phelps must show that he faced a sufficiently serious risk to his health and safety and that

Everett and Hamilton acted with deliberate indifference to his health and safety.[12] *Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir. 2010) (citing *Farmer*, 511 U.S. at 834).

### Suicide

While psychological needs manifesting themselves in suicidal tendencies are serious medical needs, there is no "generalized right of a prisoner to be protected against committing suicide." *Coffey v. Hamblen Cty.*, No. 2:15-CV-256, 2016 WL 7638454, at *5 (E.D. Tenn. Sept. 21, 2016) (citing *Rich*, 955 F.2d at 1096-97). Moreover, "[s]uicide is a difficult event to predict and prevent and often occurs without warning." *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005). Thus, the correct inquiry concerning § 1983 liability with respect to suicide is "'whether the decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure [by a defendant] to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs.'" *Coffey*, 2016 WL 7638454, at *5 (quoting *Gray*, 399 F.3d at 616 (quoting *Barber v. City of Salem*, 953 F.2d 232, 239-40 (6th Cir. 1992)) (further citations omitted)); *Linden*, 167 F. App'x at 416 (same) (quoting among other authority *Estate of Novack ex rel. Turbin v. Cty. of Wood*, 226 F.3d 525, 529 (7th Cir. 2000) ("[A] prison official must be cognizant of the significant likelihood that an inmate may imminently seek to take his own life and must fail to take reasonable steps to prevent the inmate from performing this act.")); *Nallani v. Wayne Cty.*, 665 F. App'x 498, 509 (6th Cir. 2016) (same) (citing *Barber*, 953 F.2d at 239-40). "Thus, a plaintiff must provide evidence that a strong likelihood existed that the decedent would attempt to take his own life, from which a state official could infer a

---

[12] The same standard applies to a pretrial detainee's claim concerning conditions of confinement. *See Koch v. Cty. of Franklin, Ohio*, No. 2:08-CV-1127, 2010 WL 2386352, at *12 (S.D. Ohio June 10, 2010) (citations omitted).

substantial risk of suicide; that the official in fact drew the inference; and that the official disregarded the risk." *Russell v. Davis*, 522 F. App'x 314, 317 (6th Cir. 2013) (citing *Barber*, 953 F.2d at 239-40).

### Everett

Everett contends that he is entitled to summary judgment on the subjective component of Phelps' deliberate indifference claim based on the undisputed facts that: (1) Heartland determined Phelps was not suicidal when he was discharged from Heartland to the jail on July 17, 2014; (2) Everett housed Phelps in the classification unit because that unit was near the booking desk and Phelps could be more closely observed; and (3) the jail administered Phelps' medications and provided medical and mental health care, and Phelps expressed no thoughts of self-harm or suicide from July 17 through August 18, on which date Everett personally visited Phelps, who described himself as "coping" and did not report any thoughts of suicide or self-harm.

Everett's knowledge that Phelps had engaged in self-harm in the past is insufficient, on its own, to establish that Everett knew or subjectively perceived that Phelps was at substantial risk of suicide on August 19, 2014. *Perez v. Oakland Cty.*, 466 F.3d 416, 434–35 (6th Cir. 2006) ("The fact that [defendant] knew Perez was or might be suicidal at earlier times simply does not support the inference that [defendant] knew that Perez posed a risk of suicide *at the later time,* when Perez appeared and claimed to be in a much-improved state of mind.") (emphasis in original); *see also Ellis v. Washington Cty., Tenn.*, 80 F. Supp. 2d 791, 801 (E.D. Tenn. 1998) (defendant entitled to qualified immunity where the most that can be said is that defendant knew that deceased was suicidal in the recent past). Moreover, more than a month had passed without

Phelps harming himself at the jail or expressing thoughts of self-harm or suicide. *Jerauld ex rel. Robinson v. Carl*, 405 F. App'x 970, 978 (6th Cir. 2010); *Soles v. Ingham Cty.*, 148 F. App'x 418, 419-20 (6th Cir. 2005) (No reasonable juror could find that defendant was subjectively aware that decedent would be at substantial risk for suicide where deceased had not expressed suicidal thoughts for two weeks.). Nor was there a triggering event on that day that may have alerted Everett there was a substantial likelihood Phelps would harm himself. (Phelps Dep. at 900-01 (Phelps' request to see mental health resulted from the everyday stress of being incarcerated—not by a triggering event.).)

In opposition to the motion, Phelps contends that the focus of the deliberate indifference analysis should be solely on the events of, and his medical condition on, August 19, not the month prior.[13] (Opp'n Everett Mot. at 474.) Phelps argues that, on that day, he repeatedly requested to talk with mental health and those requests were sufficient for Everett to subjectively perceive that Phelps was at a substantial risk of harming himself and, by ignoring those requests, Everett deliberately disregarded that risk.

Even assuming that Everett was aware of his requests, there is no dispute that Phelps did not tell anyone that he wanted to hurt himself. (Phelps Dep. at 926; Jamerson Dep. at 631[14] (28).) Indeed, Phelps testified that the only time he said he was going to kill himself was *after* he smashed the TV.[15] (Phelps Dep. at 949, 951-53.) Given Heartland's assessment on July 17,

---

[13] While Phelps contends that the state of his mental during the month before August 19 should not be considered, he also argues that Everett was aware of his long history of mental health issues and self-harm, and that history should have informed Everett's subjective perception of the events of that day. (Opp'n Everett Mot. at 473.)

[14] "Q. Well . . . was [Phelps] saying that he was going to hurt himself. A. No, I don't remember that. I don't think he did." (Jamerson Dep. at 631 (27).)

[15] Phelps also told Peters that he wanted to die *after* he had been removed from the classification unit and was receiving medical treatment at the jail before being transported to the hospital. (Peters Dep. at 756.)

Phelps' stable condition for more than a month, Everett's assessment of Phelps on August 18, Phelps' admission that he did not tell anyone that he wanted to harm himself the morning of August 19, and the absence of any triggering event, no reasonable juror could conclude that Everett subjectively perceived that there was a strong likelihood that Phelps would engage in self-harm before he removed the TV from the wall and began cutting himself. Even if it could be argued that Everett should have subjectively perceived that risk, but did not, his failure to do so does not constitute deliberate indifference. *Richmond*, 885 F.3d at 939 (quoting *Farmer*, 511 U.S. at 838).

Phelps further maintains that Everett was deliberately indifferent to his serious medical needs when he smashed the TV and cut his arm because, after Everett was called to the scene by Hamilton: (1) Everett cut off Peters' efforts to diffuse the situation by kicking the food chute closed, and (2) encouraged Phelps to kill himself. (Opp'n Everett Mot. at 474-75.) But Phelps has advanced no evidence that creates a dispute of fact regarding Everett's stated reason for kicking the food chute closed—to protect Peters from harm. (Everett Aff. ¶¶ 17, 18; Phelps Dep. at 927-29.) Nor does Phelps dispute that, after Everett closed the chute, Peters kept talking to Phelps and quickly calmed him down. (*See* Peters Aff. ¶ 11.)

Whether Everett and Phelps exchanged words and Everett told Phelps to go ahead and kill himself, or stated that Phelps may be subject to the use of mace, or a paintball gun or bean bag gun, is in dispute.[16] This dispute, however, does not concern a material fact. A fact is material for purposes of summary judgment if its resolution affects the outcome of the lawsuit

---

[16] *See* Milburn Dep. at 674 (12); Peters Dep. at 736; Phelps Dep. at 931; Everett Aff. ¶ 24. While the jail's video contains no audio, the video does not show a bean bag gun, or the use of paintballs or mace. (Doc. No. 57; Supp. Everett Aff. ¶ 14.)

under the governing law. *Anderson*, 477 U.S. at 248. Even if Everett did tell Phelps to go ahead and kill himself, "[t]he use of harassing or degrading language by a prison official, although unprofessional and deplorable, does not rise to constitutional dimensions." *Alexander v. Govern*, No. 2:16-CV-66, 2016 WL 2604634, at *5 (W.D. Mich. May 6, 2016), *appeal dismissed* (Sept. 1, 2016) (defendant telling plaintiff "to go ahead and kill himself because no one cared about him" fails to state a claim) (collecting cases).

More importantly, regardless of what Everett said, there is no dispute that, after Everett kicked the food chute closed, he immediately ordered his staff to prepare to extract Phelps, who was instructed to lay down and did so voluntarily. The team Everett assembled entered the classification unit and Phelps was handcuffed and removed to a booking cell for treatment at the jail until he was transported to the hospital. (*See* Peters Aff. ¶¶ 11, 12; Phelps Dep. at 920, 932; Everett Aff. ¶¶ 19-22.) The video of these events shows that only minutes passed between the time Everett kicked the food chute closed and when Phelps was removed from the classification unit and provided with medical treatment. (*See* Supp. Everett Aff. ¶¶ 6-12.)

Whether Everett was deliberately indifferent is not determined by what he said, but by what he did. "Prison officials' deliberate indifference violates an inmate's rights '[w]hen the indifference is manifested by . . . prison guards in intentionally denying or delaying access to medical care' for a serious medical need." *Phillips v. Roane Cty., Tenn.*, 534 F.3d 531, 539 (6th Cir. 2008) (quoting *Estelle,* 429 U.S. at 104-05). Everett did not deny care to Phelps or delay access to care. When called to the scene by Hamilton, Everett subjectively perceived that Phelps' was at substantial risk of harm and, after ensuring Peter's safety, took prompt steps to secure Phelps so that he could not further harm himself, and then provided him with medical

treatment.[17] Based on Everett's actions, no reasonable juror could find that Everett was deliberately indifferent to Phelps' serious medical needs.

### Hamilton

Phelps and Hamilton dispute whether the intercom button in the classification unit was pressed by Phelps, or anyone else, to communicate with Hamilton at the booking desk on August 19. (Hamilton Dep. at 319 (20-21); Phelps Dep. at 902.) At the booking desk, Hamilton had a direct view of the classification unit, but not at all times. (Hamilton Dep. at 318 (15).) If the intercom button was pressed, Hamilton denies hearing it. But even if Hamilton did hear the intercom and Phelps' request to see mental health, Phelps admits that he did not say that he was going to harm himself. Hamilton testified that she had no way of knowing what Phelps was going to do (Hamilton Dep. at 319 (20)), and Phelps has not raised a genuine issue of fact as to whether Hamilton subjectively perceived that Phelps was going to remove the TV from the wall and hurt himself. Indeed, even Phelps did not know. (Phelps Dep. at 924 ("I reacted and no thought of doing it or thinking, okay, I should do this. It's just a reaction that I just reacted with no thought."); *see also* Jamerson Dep. at 631 (28) (does not remember Phelps saying that he was going to remove the TV from the wall and cut himself).)

---

[17] Phelps contends that, when an inmate threatens to harm himself, the jail procedure requires that the inmate be placed on a 10 minute watch in booking and consultation with Community Mental Health. (Opp'n Everett Mot. at 466, citing Everett Dep.) Phelps argues that policy was violated, thereby showing deliberate indifference, because instead of placing him on 10 minute watches in booking, Peters came to attempt to calm him down. This argument is entirely without merit. Phelps could not be taken into booking and placed on 10 minute watches until the incident in progress was diffused, which is exactly what Everett and Peters did. Also, the Court notes that Phelps did not file the deposition transcript of Everett, and it is not part of the record in this case.

When Hamilton heard the other inmates in the classification unit banging on the windows, and saw that Phelps had removed the TV from the wall and cut himself, she promptly called for assistance. Peters and other jail personnel responded and stopped Phelps from further harming himself. (Hamilton Dep. at 319 (20); (Milburn Dep. at 683 (46) (Hamilton "grabbed a nurse immediately").)

Given these undisputed facts, no reasonable juror could find that based on Phelps' requests alone, Hamilton subjectively perceived and drew the inference that Phelps showed a strong likelihood he would remove the TV from the wall and harm himself. When Phelps actually did remove the TV from the wall and began cutting himself, there is no dispute that Hamilton immediately called for help and was not deliberately indifferent to Phelps' serious medical needs.

### Everett and Hamilton entitled to qualified immunity.

For the foregoing reasons, the Court finds that Phelps has not advanced evidence from which a reasonable juror could conclude that Everett and Hamilton were deliberately indifferent to Phelps' medical needs on August 19, 2014. *Russell*, 522 F. App'x at 317. Thus, as a matter of law, Everett and Hamilton did not violate Phelps' constitutional right to adequate medical care and are entitled to qualified immunity. *Conn,* 526 U.S. at 290 (quoting *Harlow,* 457 U.S. at 818).

### E.  § 1983 Claim against Wilson and Tuscarawas County

### 1.  Wilson

On summary judgment, Wilson argues that, because Phelps sued him in his official (rather than individual) capacity, Phelps' claims against Wilson are the same as his claims

against Tuscarawas County, and summary judgment should be granted in favor of Wilson on that basis. (Mot at 277.) In opposition, Phelps does not address Wilson's argument that § 1983 liability in his official capacity is functionally the same as Tuscarawas County's liability.

"[A]n action against an individual officer in his official capacity is the functional equivalence of an action against the municipality in which he serves." *Thomas v. Novicky*, No. 4:13CV1469, 2014 WL 6896576, at *7 (N.D. Ohio Dec. 8, 2014) (citing among authority *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985) (official capacity suits "'generally represent only another way of pleading an action against an entity of which the officer is an agent'") (quoting *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690, n.55, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978))). Wilson is entitled to summary judgment on Phelps' claims against him in his official capacity.

## 2. Tuscarawas County

"The deprivation of a constitutional right is a prerequisite to municipal liability under § 1983." *Pollard v. City of Columbus, Ohio*, 780 F.3d 395, 401 (6th Cir. 2015) (citing *Weeks v. Portage Cty. Exec. Offices*, 235 F.3d 275, 279 (6th Cir. 2000)). The Court has determined that no reasonable juror could conclude that Everett and Hamilton were deliberately indifferent to Phelps' serious medical needs or had violated his constitutional right as a pretrial detainee to adequate medical care. Therefore, no § 1983 liability can attach to Tuscarawas County. But even if there were a genuine issue of material fact with respect to Phelps' § 1983 claim against Everett and Hamilton, Tuscarawas County would still be entitled to summary judgment.

Phelps alleges that Tuscarawas County is liable pursuant to § 1983 because Tuscarawas County failed to have adequate policies, procedures, customs, and protocols regarding

identification, referral, and treatment of individuals with mental illness and self-injurious behavior, and failed to train and supervise jail staff in this regard, resulting in the deprivation of Phelps' constitutional rights to adequate medical care for his serious medical needs on August 19, 2014. (*See* Compl. ¶¶ 33-36.) "[M]unicipal liability under section 1983 may only attach where the 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury' complained of." *Estate of Graham v. Cty. of Washtenaw*, 358 F.3d 377, 382 (6th Cir. 2004) (quoting *Monell*, 436 U.S. at 694). Tuscarawas County cannot be held vicariously liable for Everett's and Hamilton's alleged violation of Phelps' constitutional rights, but can only be held liable under § 1983 for actions taken by Everett and Hamilton pursuant to a policy of the county, the execution of which caused Phelps's injury. *See Miller v. Calhoun Cty.*, 408 F.3d 803, 813 (6th Cir. 2005) (citation omitted). On summary judgment, the "primary issue is whether [Phelps] has alleged sufficient facts to establish that the alleged constitutional violation happened *because of* the execution of [the County's] policy.'" *Estate of Graham*, 358 F.3d at 383 (emphasis in original) (quoting *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993)).

Tuscarawas County argues that it is entitled to judgment because Phelps has failed to identify a specific policy or custom pursuant to which Everett and Hamilton acted to deprive him of his constitutional right to adequate medical care as pretrial detainee. (Tusc. Cty. Mot. 47 at 276.) "In fact, the plaintiff's claim is that the County failed to have adequate policies, procedures and customs regarding identification, referral and treatment due inmates experiencing symptoms of bipolar, schizophrenia, extreme self-harm, and being suicidal. … Further, the plaintiff claims that the County failed to adequately train and supervise the jail staff without providing an

explanation of what that training was supposed to be or an explanation of how it would directly have been applied to cause of [sic] prevent plaintiff's unique actions." (*Id.* at 276, citing Compl. ¶¶ 34-35.) Phelps does not identify a policy pursuant to which he claims Everett and Hamilton acted (nor explain how any policy caused Phelps' injury). *Estate of Graham*, 358 F.3d at 383; *see also Jackson v. Mowry*, No. 1:12 CV 3083, 2013 WL 526916, at *3 (N.D. Ohio Feb. 11, 2013) (county entitled to judgment where plaintiff does not set forth any factual allegations that either identify a particular county custom or policy or connect that policy to defendant's alleged deliberate indifference to plaintiff's serious medical needs) (citing *Estate of Graham*, 358 F.3d at 383).

In opposing the motion, Phelps argues that Tuscarawas County and Wilson are liable under § 1983 because the county ratified Everett's and Hamilton's alleged unconstitutional conduct. Ratification is one way that Phelps can make a showing of an illegal policy or custom. *See Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)). Citing Wilson's deposition, Phelps maintains that Wilson witnessed the incident on August 19, 2014, approved a false report by Hamilton,[18] did not require Everett to write a report, did not conduct a meaningful investigation, and did not punish Hamilton or Everett for their unconstitutional behavior despite witnessing their conduct. Phelps argues that Wilson's failure to conduct a bona fide investigation into the incident amounts to ratification by Tuscarawas County of Everett's and Hamilton's actions. (Opp'n Tusc. Cty. Mot. at 351-53.)

---

[18] Phelps does not specify the portion of Hamilton's report that he claims is false.

*Monell* liability can be established by a showing that the county ratified Hamilton and Everett's alleged unconstitutional acts by failing to meaningfully investigate and punish allegations of unconstitutional conduct. *France v. Lucas*, No. 1:07CV3519, 2012 WL 5207555, at *10 (N.D. Ohio Oct. 22, 2012), *aff'd*, 836 F.3d 612 (6th Cir. 2016) (citing *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1247 (6th Cir. 1989)). "'A municipality's failure to investigate claims of wrongful conduct, however, does not constitute a *per se* conclusion that the municipality has a policy of tolerating violations of citizens['] rights.'" *Stillwagon v. City of Delaware*, 274 F. Supp. 3d 714, 773 (S.D. Ohio 2017) (quoting *Gorecki v. City of Cambridge*, No. C2-07-420, 2009 WL 3242296, at *2 (S.D. Ohio Oct. 8, 2009). "As the Sixth Circuit has warned, inferring a municipal-wide policy based solely on one instance of misconduct runs dangerously close to 'the collapsing of the municipal liability standard into a simple *respondeat superior* standard.'" *Id.* (quoting *City of Chattanooga*, 398 F.3d at 432-33). Even with respect to a failure-to-investigate *Monell* claim, the "guiding principle" of municipal liability is that the government, as an entity, is responsible under § 1983 "'when execution of [the] government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury. . . .'" *Gorecki*, 2009 WL 3242296, at *2 (quoting *Monell*, 436 U.S. at 694). "[T]o be liable under a ratification theory, the municipality's failure to investigate must be indicative of an official policy." *Id.* And "[t]here must be 'a direct causal link' between the policy and the alleged constitutional violation such that the County's 'deliberate conduct' can be deemed the 'moving force' behind the violation. *Estate of Graham*, 358 F.3d at 383 (quoting *Waters v. City of Morristown*, 242 F.3d 353, 362 (6th Cir. 2001) (citing

*Bd. of Cty. Comm'rs v. Brown,* 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997))

(quotation marks omitted) (further citation omitted)).

Thus, to establish his *Monell* claim, Phelps "must show not only that the investigation

was inadequate, but that the flaws in th[e] particular investigation were representative of (1) a

clear and persistent pattern of illegal activity, (2) which [Tuscarawas County] knew or should

have known about, (3) yet remained deliberately indifferent about, and (4) that the [Tuscawaras

County's] custom was the cause [of Phelps' injury]." *City of Chattanooga,* 398 F.3d at 432-33.

Even if the Court were to assume for the purpose of this analysis that the investigation

conducted by Wilson was inadequate, Phelps has presented no evidence indicating that

Tuscarawas County has not, in the past, investigated and disciplined officers involved in failed

suicide attempts by inmates in the jail, from which an inference in Phelps' favor could be drawn

that the alleged inadequate investigation was conducted pursuant to an official policy or custom

and was the moving force behind Hamilton and Everett's alleged unconstitutional conduct. *Smith*

*v. City of Troy, Ohio*, 874 F.3d 938, 947 (6th Cir. 2017) (Plaintiff has not shown that the

municipal defendants have demonstrated a pattern of inadequately investigating excessive force

claims, nor shown their alleged inadequate investigation, or alleged post hoc ratification of the

officer's conduct, was a source of injury to him.) (citing *Burgess*, 735 F.3d at 478); *Family Serv.*

*Ass'n of Steubenville v. Wells Twp.*, No. 2:12-CV-135, 2014 WL 11516089, at *8-9 (S.D. Ohio

Sept. 18, 2014), *aff'd sub nom. Family Serv. Ass'n ex rel. Coil v. Wells Twp.*, 783 F.3d 600 (6th

Cir. 2015); *Gorecki*, 2009 WL 3242296, at *4; *see also Brown v. Shaner,* 172 F.3d 927, 931 (6th

Cir. 1999) (finding that summary judgment for the municipality was proper where plaintiffs

produced no evidence indicating that the city had in the past failed to investigate and discipline

the use of excessive force by its police personnel where such discipline was justified). Because there is no genuine issue of material fact from which a reasonable juror could conclude that Phelps has satisfied all of the elements of his *Monell* claim, Tuscawaras County is entitled to summary judgment. *Celotex,* 477 U.S. at 322-23.

### III. CONCLUSION

For all of the foregoing reasons, the motions for summary judgment of Everett (Doc. No. 46) and the Tuscarawas County defendants (Doc. No. 47) are granted.

**IT IS SO ORDERED**.

Dated: May 16, 2018

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**